Stanley R. CRAIG, Plaintiff,

v.

OHIO DEPARTMENT OF AD-
MINISTRATIVE SERVIC-
ES, et al., Defendants.

No. C–2–87–0987.

United States District Court,
S.D. Ohio, E.D.

March 20, 1992.

Terrence L. Gallagher, Columbus, Ohio, for plaintiff.

Timothy J. Mangan, Asst. Atty. Gen., Columbus, Ohio and Gary Herfel, Dinsmore & Shohl, Florence, Ky., for defendants.

## AMENDED OPINION AND ORDER [1]

KINNEARY, Senior District Judge.

This matter comes before the Court to consider the Defendant's motion for summary judgment. Fed.R.Civ.P. 56(b).

### I. STATEMENT OF THE CASE

This is an action for money damages and the return of property alleged to have been converted by the Defendants. As originally filed, the Plaintiff sought relief for alleged racial discrimination under several theories, including 42 U.S.C. §§ 1981, 1983, 1985, and 1986. The only claim which remains is his section 1981 claim.

The Plaintiff, Stanley Craig, is a black man and the owner and operator of a business known as the Craig Wrecking Company. On August 29, 1984, the Plaintiff entered into a contract to perform demolition services and asbestos removal at the Ohio State University for the Ohio Department of Administrative Services (ODAS). The specifications upon which the Plaintiff prepared his bid were supplied by the Defendant Fosdick & Hilmer, Inc., an architectural firm, (hereinafter "the firm"), and its officer, the Defendant Otto Hilmer.

In his Complaint, the Plaintiff alleges that the Defendants conspired to render performance of the contract impossible, while simultaneously rendering assistance to white contractors to facilitate their projects at the worksite. He claims that

---

**1.** This Order is filed *nun pro tunc* for purposes of publication and contains no substantive alter-   ations.

the firm refused to provide him with timely plans and specifications despite the fact that such cooperation was afforded to similarly situated white contractors. It is also claimed that the Defendant Daniel Shields, the Deputy Director of Public Works, required the Plaintiff to perform substantial duties outside the scope of his contract without a corresponding increase in remuneration or extensions of time within which to complete the additional tasks. He further claims that the Defendant Walter Gaub, the State's Architect's Office Field Representative, refused to provide the requisite approval for the Plaintiff's asbestos removal plan until five months after the expected completion date of the contract. Gaub is also alleged to have issued a negative progress report relative to the Plaintiff's work despite the fact he never personally reviewed the actual worksite. Shields terminated the Plaintiff's contract on August 15, 1985.

At the request of this Court, the parties filed motions for summary judgment dealing with the applicability of *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) to this action. In response to these motions, the Plaintiff filed a set of affidavits apparently changing the theory which was set forth in the Complaint. The Plaintiff now refers the Court to the events occurring in May of 1984 when he attended a pre-bid meeting for minority contractors in which the specifications for the demolition job were made available. Based on the information presented at that meeting, the Plaintiff prepared a bid which he later discovered was seriously deficient in the estimate of the work to be done. He further claims that, unbeknownst to the attendees at the meeting, the Defendants were in possession of information which was far more complete with respect to the scope of the job, and, at the direction of the Defendant Myers, this information was made available to white contractors and deliberately withheld from minority contractors.

Once it became evident to the Plaintiff that the job exceeded the scope of his original proposal, he requested a change order, pursuant to the terms of his original contract, which would have allowed for additional work to be performed for additional remuneration. The Plaintiff argues that change orders are standard in the industry, and are routinely entered into whenever the parties discover that there has been a mistake as to the extent of the work contemplated in the original contract. He asseverates that such changes constitute new contracts. Craig alleges that his request was denied, despite the fact that white contractors were routinely granted such requests. Only one change was approved for the Plaintiff, which he characterized as insignificant.

Therefore, while in the Complaint the Plaintiff averred facts which indicated that the contract was *terminated* for discriminatory reasons, it is now Craig's contention that the Defendants discriminated against him in the *formation* of the contract by refusing to provide him information necessary to adequately estimate the scope of the work he would need to perform. Thus the discriminatory withholding of information rendered performance of the contract impossible. In addition, Craig also contends that his ability to enter into new agreements was hindered because of his race. This theoretical switch was no doubt prompted by the holding in *Patterson* that section 1981 "protection[ ] extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment." *Patterson*, 491 U.S. at 176, 109 S.Ct. at 2372.

During the pendency of this motion Congress passed the Civil Rights Act of 1991 (hereinafter "the Act"). The Act expands the scope of section 1981 to include discrimination which occurs after the formation of a contract. Thus, under the Act, the post-formation conduct alleged in the original complaint would also be cognizable in this action. The Court requested that the parties address the question whether the Act applies to this case. Thus the Court must determine whether the new theory of liability creates factual issue for determination at trial, and whether the additional reme-

dies available under the amended section 1981 are available to the Plaintiff.

## II. STANDARD OF REVIEW

■ In considering the Plaintiff's motion, the Court is mindful that summary judgment is appropriate only in limited circumstances. Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The United States Supreme Court has held, however, that the standard of summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This is true where, for instance, the dispute turns only on a legal question and the moving party must prevail as a matter of law even if the Court were to resolve all factual disputes in favor of the non-moving party. *See Ross v. Franzen*, 777 F.2d 1216, 1222 (7th Cir.1985); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2725, at 79 (2d ed. 1983).

A summary judgment motion also requires special treatment of the record. The Court "must view the evidence presented through the prism of the substantive evidentiary burden" and determine "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson*, 477 U.S. at 252, 254, 106 S.Ct. at 2512, 2513; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nonetheless, in making this determination the Court may not impinge upon the proper function of the jury. Therefore, all of "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. With this standard in mind, the Court will address the Plaintiff's motion.

## III. STATUTORY PRESUMPTION

■ Until recently, section 1981 provided in part:

> All persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts … as is enjoyed by white citizens.

42 U.S.C. § 1981 (1988). In *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court interpreted section 1981 to protect individuals from racial discrimination in the formation of contracts and in access to judicial and non-judicial dispute resolution of disputes arising from such discrimination.

> By its plain terms, the relevant provision in § 1981 protects two rights: "the same right … to make … contracts" and "the same right … to … enforce contracts." The first of these protections extends only to the formation of a contract, but not to problems that may arise later from the conditions of continuing employment.… Such postformation conduct does not involve the right to make a contract, but rather implicates performance of established contract obligations and the conditions of continuing employment, matters more naturally governed by state contract law and Title VII.

*Patterson*, 491 U.S. at 177, 109 S.Ct. at 2373. However, on November 21, 1991, section 1981 was amended by section 101 of the Act, and now includes the following provisions in addition to that stated above:

> (b) For purposes of this section, the term "make and enforce contracts" in-

cludes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Civil Rights Act of 1991, Pub.L. No. 102–166, § 101, 105 Stat. 1071 (to be codified at 42 U.S.C. § 1981(b, c)). Thus the restrictive rule announced in *Patterson* was nullified, and the scope of protection afforded by section 1981 is greatly increased. The question with which the Court is faced is whether Mr. Craig may avail himself of the new remedies codified in the amended statute.

The Court is here confronted with a question which has already faced other courts: [2] whether the Civil Rights Act of 1991 should be applied retroactively to cases pending on the date of enactment. The Defendants urge the Court to adopt a presumption in favor of prospective application of the Civil Rights Act of 1991 based upon two recent cases: *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) and *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Unfortunately, there is a competing line of cases, *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), and *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969) which, though not relied upon by the Plaintiff, are in apparent conflict with those cited by the Defendants. Because the presumption utilized by the Court will have a significant bearing on its review of the Act, we must endeavor first to resolve the conflict between the two lines of cases. Then the Court will proceed to examine the language and history of the new law in light of the adopted presumption.

### A. The Bradley Rule

*Bradley* was a school desegregation case in which the plaintiffs, as a prevailing par-

ty, sought and were awarded attorneys' fees despite the absence of a statute allowing such an award. The appellate court reversed the fee award. However, after the case was submitted to the court of appeals, but before the case was decided, Congress passed the Education Amendments of 1972, which included a provision for attorneys' fees in desegregation cases. The Supreme Court reversed the appellate court and held that the fee statute was deserving of retroactive application. The Court stated that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. The Court relied upon a then-recent decision, *Thorpe v. Housing Auth. of Durham*, 386 U.S. 670, 87 S.Ct. 1244, 18 L.Ed.2d 394 (1967), for the proposition that "even where the intervening law does not explicitly recite that it is to be applied in pending cases, it is to be given recognition and effect." *Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018. Thus the *Thorpe/Bradley* line of cases establishes a presumption of retroactive application unless the statutory language or history explicitly limits the statute to prospective application. The Court rejected the "contention that a change in the law is to be given effect only where that is the clear and stated intention of the legislature." *Id.*

### B. The Bowen Rule

In contrast to these cases is *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). In *Bowen* the Court was faced with the question whether the Secretary of Health and Human Services had the authority to promulgate rules retroactively. The secretary had unsuccessfully attempted to implement a cost-limit schedule setting the levels of Medicare costs that could be reimbursed to participating hospitals. Owing to defects in the notice and hearing requirements in the passage of the Rule, a district court

---

2. *See infra* n. 6.

ruled that the Secretary had violated the Administrative Procedure Act, and struck down the cost-limit schedule. Subsequently, the Secretary issued a new Rule which allowed it to recoup monies paid to the hospitals as a result of the failure of the earlier Rule. In effect, the Secretary propounded a retroactive Rule. In striking down the new Rule, the Supreme Court stated that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Id.* at 208, 109 S.Ct. at 2389.

More recently, in *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Court reiterated the *Bowen* rule when it was confronted with the retroactive application of a postjudgment interest statute. The respondents were shareholders of a defunct aluminum fabricating company who sued the petitioner for violations of the Sherman Act. The respondents prevailed at trial and judgment was entered on August 22, 1979. The court, however, ordered a limited retrial on the issue of damages, which resulted in a final judgment entry on December 4, 1981. The court later granted a partial judgment notwithstanding the verdict, setting aside a portion of the jury award. The court of appeals vacated the JNOV, and remanded the case to the district court, with the mandate issuing in 1986.

However, on April 2, 1982, Congress amended the controlling postjudgment interest statute. *Bonjorno* wished to have the amended version of the statute applied to his claim, despite the fact it was not effective until after the 1981 judgment entry. The appellate court ruled, pursuant to *Bradley*, that the amended version of the statute applied, in accord with the *Bradley* rule that the law in effect at the time of a court's decision is to be controlling.

The Supreme Court reversed the appellate court, and held that the plain language of the statute required prospective application of the amended statute, thus precluding application to Bonjorno's claim. Although the court noted the "apparent tension" between the *Bradley* case and the rule followed in *Bowen* and *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), it declined to resolve the conflict at that time. Nevertheless, Justice Scalia argued that *Bradley* and *Bowen* were inconsistent and maintained that *Bradley* should be overruled. In a persuasive concurrence, Justice Scalia reviewed the history of those cases which have dealt with the retroactivity of statutes, citing the following propositions of law:

> "Where it is claimed that a law is to have a retrospective operation, such must be clearly the intention, evidenced in the law and its purposes, or the court will presume that the lawmaking power is acting for the future only and not for the past...." *White v. United States*, 191 U.S. 545, 552 [24 S.Ct. 171, 172, 48 L.Ed. 295] (1903).

> There are certain principles which have been adhered to with great strictness by the courts in relation to the construction of statutes as to whether they are or are not retroactive in their effect. The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other. It ought not to receive such a construction unless the words are so clear, strong, and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot otherwise be satisfied. *United States Fidelity & Guaranty Co. v. Struthers Wells Co.*, 209 U.S. 306, 314 [28 S.Ct. 537, 539, 52 L.Ed. 804] (1908).

.    .    .    .    .

> The initial admonition is that laws are not to be considered as applying to cases which arose before their passage unless that intention be clearly declared.... If the absence of such determining declaration leaves the statute to double sense, it is the command of the cases, that which rejects retroactive application must be selected. *Shwab v. Doyle*, 258 U.S. 529,

534–35 [42 S.Ct. 391, 392, 66 L.Ed. 747] (1922).

*Bonjorno,* 494 U.S. at 843–44, 110 S.Ct. at 1580 (Scalia, J., concurring). The *Bonjorno* case, and those cited by Justice Scalia, stand for the proposition that absent clear congressional intent to the contrary, statutes are presumed to apply only prospectively.

### C. The Sixth Circuit Rule

The Sixth Circuit has recently had the opportunity to address the apparent contradiction between these cases in the context of the False Claims Act. In *United States v. Murphy,* 937 F.2d 1032 (6th Cir.1991), faced with a statute which provided no clear indication of whether it was to be applied retroactively, the court was forced "to choose between the broad statement of the law in *Bradley* and the recent affirmation in *Bowen* of the general rule against retroactive application." *Id.* at 1037. The court began by observing that, in *Boddie v. American Broadcasting Cos.,* 881 F.2d 267 (6th Cir.1989), *cert. denied.,* 493 U.S. 1028, 110 S.Ct. 737, 107 L.Ed.2d 755 (1990), it followed *Bennett v. New Jersey,* 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985) and rejected application of *Bradley,* stating:

> More recent decisions, however, make clear that *Bradley* represents a relatively narrow exception to the general "principle that statutes operate only prospectively," a notion "familiar to every law student." These post-*Bradley* cases have reaffirmed the "venerable rule ... that statutes affecting substantive rights and liabilities are presumed to have only prospective effect."

*Murphy,* 937 F.2d at 1037 (quoting *Boddie,* 881 F.2d at 270). The court then found that because the pre-amendment False Claims Act would impose liability only where there was actual knowledge of falsity, whereas the amended Act would impose liability with mere constructive knowledge, the amendments affected substantive rights and liabilities and could not be applied retroactively. *Id.* at 1038.

The language of *Murphy* leaves some confusion as to the state of the law in this circuit, for the court referred to *Bradley* as both "a broad statement of the law" and "a relatively narrow exception to the general 'principle that statutes operate only prospectively.'" It is not clear in what sense *Bradley* can be either a broad statement or an exception to the general presumption of nonretroactivity. To begin with, the language of *Bradley* seems to indicate that it is subordinate to the general rule of nonretroactivity.

> The second aspect of the Court's concern that injustice may arise from retrospective application of a change in law relates to the nature of the rights effected by the change. The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would infringe upon or deprive a person of a right that had matured or become unconditional.

*Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. In other words, vested rights are not to be divested by intervening law because such a result would be manifestly unfair. This statement comports with the idea that substantive enactments are presumed to have prospective application. *Bennett,* 470 U.S. at 639, 105 S.Ct. at 1560. Thus the court identified divestment of a matured right as the type of circumstance which would require prospective application of a new law. This is simply another way of stating the longstanding rule that, absent clear language or legislative history to the contrary, statutes affecting substantive rights will not be retroactively applied. It is apparent, therefore, that *Bradley,* as construed by *Bennett,* leaves untouched the general presumption favoring nonretroactivity of substantive statutes.

This conclusion is supported by the fact that the statute at issue in *Bradley* was an attorney fee statute, which was remedial in nature. It is at least arguable that when a procedural or remedial statute is at issue, there is a stronger presumption that it will be applied retroactively. *See, e.g., Lussier v. Dugger,* 904 F.2d 661, 665 (11th Cir. 1990). Thus the *Bradley* "rule" is no more than a reiteration of an existing line of authority that alters the traditional pre-

sumption in nonsubstantive matters. Viewed this way, it is plain that the case does not represent an exception to the *Bowen* rule at all; it simply illustrates a different rule.

However, were we to assume that the *Bradley* presumption applied to substantive statutes, it would produce a nonsensical result. The issue in the case was the applicability of the attorney fee statute where the propriety of a fee award was pending resolution on appeal when the statute was enacted. *Bradley,* 416 U.S. at 710, 94 S.Ct. at 2015. Thus it stands literally for the proposition that where there has been an initial adjudication which is pending appeal, the court must apply a new statute retroactively, absent manifest injustice. Yet if such is the case, there is no principled reason why the rule ought not to be extended to include cases in which there has been no initial adjudication at all.[3] Indeed, this result was suggested in *Bradley* when the Court stated

> Accordingly, we must reject the contention that a change in the law is to be given effect in a *pending* case *only* where that is the clear and stated intention of the legislature.

*Id.* at 715, 94 S.Ct. at 2018 (emphasis added). Yet if this is a rule of general application to substantive statutes, then it is at odds with the *Bowen* rule which disfavors retroactive application absent clear language or legislative history to the contrary. Thus it is impossible to argue that *Bradley* is in any sense an "exception" to the *Bowen* rule. To the contrary, the two cases stand in diametric opposition to one another. Therefore, if *Bradley,* as construed by *Bennett,* is taken literally, then it states a different, and not inconsistent rule, than that found in *Bowen.* On the other hand, if *Bradley* is understood to apply to substantive statutes, then it is contrary to

*Bowen.* In no event, however, is it an exception to the *Bowen* rule.

It is clear from the *Murphy* case, however, that the Sixth Circuit favors the *Bowen* presumption. Indeed, immediately prior to release of this order, the Sixth Circuit approved *Bowen* in its review of the Civil Rights Act of 1991. *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.1992). Therefore, we will review the Act under the guidance of *Bowen.*

## IV. TEXTUAL ANALYSIS

The starting point for analysis of a statute is the statutory language itself. Absent a clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Section 402 of the Act provides:

> (a) In General.—Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment.

At first blush, the language of section 402(a) indicates that the Act is to apply prospectively. If the Act "take[s] effect upon enactment," then it can be of no effect prior to that date. It follows quite naturally that if the provisions of the Act are without effect until November 21, 1991, then conduct which occurred prior to that time, and hence cases pending at that time, would not be subject to any of the obligations imposed by the Act. There is certainly nothing in the language of section 402(a) which states that the Act is to be applied to cases which were pending at the time the Act became effective.

The Court presumes that this choice of language is intentional, given the presumption that Congress is able to communicate clearly its meaning in statutory language, especially where retroactivity in a matter

---

**3.** Justice Scalia observed as much when he stated that it would be irrational to apply the *Bradley* presumption since it would "mean nonsuiting a plaintiff who has won a tort judgment that is on appeal when the statute abolishing the tort is enacted, while rendering judgment in favor of plaintiffs who sue later on preenactment torts."

*Bonjorno,* 494 U.S. at 854, 110 S.Ct. at 1586. Justice Scalia went on to note that "[p]erhaps it would be rational to do the opposite—that is, to say that acts which have been *initially* adjudicated ... will *not* be affected by a new law, even when acts not yet adjudicated *are* affected." *Id.* at n. 2 (emphasis in original).

of national importance is at issue. For example, section 14 of the Equal Employment Opportunity Act, 86 Stat. 113 states: "The amendments made by this Act to section 706 of the Civil Rights Act of 1964 shall be applicable with respect to charges pending with the [Equal Employment Opportunity] Commission on the date of enactment of this Act and all charges filed thereafter." Such language, in contrast to the language of section 402(a), is unmistakable in its import.[4] Thus the language of section 402(a) supports prospective application of the Act.

The language of 402(a) does indicate that there are exceptions to the immediate enactment of the Act. One such example is section 402(b), which provides:

> (b) Certain Disparate Cases—Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate case for which a complaint was filed before March 1, 1975 and for which an initial decision was filed after October 30, 1983.

By its terms, section 402(b) indicates that the Act will not apply to this particular type of case, which is understood to be a specific reference to *Wards Cove v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).[5] This extraordinary provision indicates that the Act is of no effect in that apparently ongoing litigation. It is argued by those favoring retroactive application that if the Act were meant to be prospective, then there would be no reason to include a provision protecting a certain group of litigants from retroactive application. Thus there is a negative inference of retroactivity.

In support of this contention, proponents argue that it is well settled that "no provision [of a statute] should be construed to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778, 108 S.Ct. 1537, 1550, 99 L.Ed.2d 839 (1988). Moreover, courts should not "adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988). It is submitted, therefore, that the necessary implication of section 402(b) is that the Act generally is intended to be applied retroactively, with the limited exception of section 402(b). Thus section 402(b) provides some support for retroactive application of the Act.

The next section relevant to this inquiry is section 109, which deals with protection of extraterritorial employment and was prompted by the Supreme Court decision in *E.E.O.C. v. Arabian American Oil Co.*, — U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). In that case the Government held that Title VII does not apply to employment in foreign countries. Section 109(c) provides:

> (c) Application of Amendments.—The amendments made by this section shall not apply with respect to conduct occurring before the date of the enactment of this Act.

The same negative inference created by section 402(b) exists here. Were the Act to be prospective in application, there would be no need to state that it does not apply retroactively in this situation. Thus section 109(c) provides some support for retroactive application of the Act. *See also* section 110(b) (establishing Training Institute, which is to be "effective upon enactment of this Act").

---

4. *See also* the Black Lung Benefits Act, 30 U.S.C. § 945(a)(1), (c) (1988), which provides:
(a)(1) The Secretary of Health and Human Services shall promptly notify each claimant who has filed a claim for benefits ... and whose claim is either pending on March 1, 1978, or has been denied on or before that date ...

(c) Award of benefits on retroactive basis. Any individual whose claim is approved pursuant to this section shall be awarded benefits on a retroactive basis for a period which begins no earlier than January 1, 1974.

5. *See infra* pp. 766–767.

That sections 402(b) and 109(c) provide some support through negative inference that the Act is to apply retroactively, however, fails to evince the "clear, strong, and imperative" words to which "no other meaning can be annexed," as required under the regime of *United States Fidelity & Guaranty Co. v. Struthers Wells Co.*, 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908). To conclude otherwise would strain the limits of ordinary comprehension in a manner wholly unwarranted by the language with which Congress has chosen to express itself. In light of Congress' proven ability to state its intentions clearly, and the reasonable import of the language of the 1991 Act, the Court concludes that the statutory language provides no support for retroactive application of the Act.

## V. LEGISLATIVE HISTORY

This does not end the matter, however, for retroactivity may still be found where the legislative history of the statute makes such intent clear. The first portion of legislative history which is relevant to this question appears in the interpretive memorandum of one of the Act's co-sponsors, Senator Danforth, which provides

that, unless otherwise specified, the provisions of this legislation shall take effect upon enactment and *shall not apply retroactively.*

137 Cong.Rec. S15,485 (daily ed. Oct. 30, 1991) (emphasis added). Senator Danforth further stated:

My review of Supreme Court case law supports my reading that in the absence of an explicit provision to the contrary, no new legislation is applied retroactively. Rather, new statutes are to be given prospective application only, unless Congress explicitly directs otherwise, *which we have not done in this instance....* Our intention in drafting the effective date provision was to adhere to the principle followed by the vast majority of Supreme Court cases and exemplified in *Bowen* and Justice Scalia's concurrence in *Bonjorno.*

*Id.* at S15,483 (emphasis added). Senator Dole concurred in this view, stating that the Act would

not apply to cases arising before the effective date of the Act. *See [Bowen];* *c.f. [Bonjorno]* (declining to resolve conflict between *[Bowen* and *Bradley]*.

*Id.* at S15,478. Senator Dole was joined in this interpretation by Senators Burns, Cochran, Garn, Gorton, Grassley, Hatch, Mack, McCain, McConnel, Murkowski, Simpson, Seymour, and Thurmond. *Id.* at S15,472.

Senator Kennedy, another of the legislation's co-sponsors, took a somewhat different view. He stated that

[i]t will be up to the courts to determine the extent to which the bill will apply to cases and claims that are pending on the date of enactment. Ordinarily, courts in such cases apply newly enacted procedures and remedies to pending cases. That was the Supreme Court's holding in *Bradley....* And where a new rule is merely a restoration of a prior rule that had been changed by the courts, the newly restored rule is often applied retroactively.

*Id.* at S14,485. Despite Senator Kennedy's statement that resolution of the retroactivity question should be left to the courts, his reference to remedies and procedures may indicate that he was relying on *Bradley* to provide for retroactivity only in nonsubstantive matters. Unmistakable in his comments, however, is his desire for the courts, not Congress, to determine the retroactivity question. Yet it is to Congress that the courts must turn for direction in such matters. Thus Senator Kennedy's remarks fail to evince a clear intention by Congress to determine the retroactivity question. The Court concludes, therefore, that, at a minimum, the foregoing statements from the floor debate indicate a split of opinion as to the effect of the Act thus precluding the conclusion that "the intention of the legislature cannot ... be satisfied" absent retroactive application. *United States Fidelity & Guaranty Co.*, 209 U.S. at 314, 28 S.Ct. at 539.

The Court notes further that the negative inference of retroactivity created by section 402(b) is wholly neutralized by the history of the Act. The sponsor of that amendment, Senator Murkowski of Alaska, stated:

I have been informed by the sponsors that their intent is that the bill not apply retroactively. I strongly support this intent.

The inclusion of language regarding this case should not be interpreted as a precedent for any other case. Nor should it be viewed as creating an implication regarding whether or not this legislation applies retroactively generally. It is to be interpreted as a congressional determination that regardless of how the issue is resolved, the *Wards Cove* case is one in which it is clear that this legislation should not apply retroactively.

137 Cong.Rec. S15,493 (daily ed. Oct. 30, 1991). Senator Danforth echoed this sentiment.

Subsection 22(b), regarding certain disparate impact cases, is intended only to provide additional assurance that the provisions of this bill will not be applied to certain cases that fit the provisions in that subsection. It should not be read in derogation of the sponsor's intention not to provide for retroactive effect or application as expressed in subsection 22(a) of the bill.

*Id.* at S15,483. Senator Dole agreed, stating

Absolutely no inference is intended or should be drawn from the language of this amendment to section 402 that the provisions of the Act or the amendments it makes may otherwise apply retroactively to conduct occurring before the date of enactment of this Act. Such retroactive application of the Act is not intended: on the contrary, the intention of this amendment to section 402 is simply to honor a commitment to eliminate every shadow of doubt as to any possibility of retroactive application to the case involving the Wards Cove Company.

137 Cong.Rec. S15,953 (daily ed. Nov. 5, 1991). Senators Durenberger and Simpson agreed with Senator Dole as to the relevance of section 402(b) to the general retroactivity question. *See Id.* at S15,966. These statements unequivocally defeat any inference that section 402(b) by negative inference establishes that the remainder of the Act is retroactive in application. Thus one of the few arguments from the plain language of the statute supportive of retroactivity is no longer useful for that purpose. Therefore, the Court concludes that there is a complete absence in the legislative history of any clear indicia that Congress intended the Act to operate retroactively.

It is also instructive to compare the relevant provisions of the Civil Rights Act of 1990 which fell victim to the presidential veto power, for a even cursory examination reveals fundamental differences between the two pieces of legislation. The omitted provisions from the failed bill are strongly suggestive that the current language was consciously chosen to forestall the possibility of yet another presidential veto. For example, S2,104 was the conference version of the bill which was approved by the Senate on October 16, 1990 (136 Cong.Rec. S15,327) and by the House on October 17, 1990 (136 Cong.Rec. H9,984). Section 15 of S2,104, entitled Application of Amendments and Transition Rules, contained specific provisions allowing for retroactive application of the Act to the date upon which the Supreme Court rendered the decisions which Congress sought to alter. Section 1981 claims were governed by section 12 of the 1990 Act, and section 15 provided: "(a) The amendments made by—(6) section 12 shall apply to all proceedings pending on or commenced after June 15, 1989." H.R. 1 (1991), the original House version of the 1991 Act, contained language identical to that contained in section 15 of S2,104. *See* 1, 102nd Cong., 1st Sess. S113 (1991). The version which President Bush signed into law, however, did not contain that language. It is clear that Congress cleared the road to compromise through its decision to sacrifice the retroactivity issue, reasoning, no doubt, that a compromise bill was better than no bill at all. Thus the language of the failed legislation, when

compared with the new legislation, refutes utterly the contention that the 1991 Act is to apply retrospectively.

The Court's conclusion is strengthened by the EEOC Policy Guideline Report. E.E.O.C.: Policy Guide on Retroactivity of the Civil Rights Act of 1991, Labor Relations Reporter (BNA), Vol 8C, No. 688, at 405: 6971–75 (Dec. 27, 1991) (hereinafter "the Report"). It is a trusted maxim of the law that where an administrative agency charged with promulgating regulations to effect the law issues a reasonable or permissible construction of a statute, the courts will accord that interpretation great deference. *Rust v. Sullivan*, 500 U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Where the construction is plausible in light of the plain language of the statute and does not otherwise conflict with Congress' expressed intent, it may be accepted by the court. *Id.*, 111 S.Ct. at 1767. "The court need not conclude that the agency construction was the only one it could permissibly have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Rather, substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it. *Id.* at 844, 104 S.Ct. at 2782.

The Report considers the question whether the compensatory and punitive damages provisions of the Act apply to charges challenging conduct that occurred prior to the effective date of the Act. To determine this question the EEOC examined section 402(b) and 109(c). With respect to section 402(b), the EEOC concluded, based upon Senator Danforth's statements during the Senate floor debates that it was meant only

to provide assurances to the Wards Cove Company that its twenty-year lawsuit with Frank Atonio could come to an end. Report at 3–4. Acknowledging that some ambiguity remained, the EEOC went on to analyze the judicial precedents governing presumptions of retroactivity versus prospectivity. After reviewing the *Bradley* case and the *Bowen/Bonjorno* line of cases, the EEOC concluded that

> *Bowen* represents the Supreme Court's more recent holding on this issue, and the Commission will follow the dictates of the case with regard to retroactivity of the damages provisions. Accordingly, the Commission will not seek damages in charges filed prior to enactment of the Act, or in post-Act charges that challenge pre-Act conduct.

*Id.* at 7.

Although the Report deals only with remedial and procedural aspects of the Act, the Commission's reliance on *Bowen* indicates its preference for a presumption of prospective application of the Act. Moreover, if the Commission is reluctant to apply procedural and remedial provisions of the Act retroactively, it is certain that it would not seek to apply substantive portions of the Act retroactively. Given the ambiguity in the Act, the Court concludes that the Commission's reading of the Act is a permissible one, and is deserving of deference in this matter.

## VI. COURT DECISIONS

Finally, and perhaps most daunting, the Court turns to examine those cases which have considered the retroactivity question. If ever one needed a scorecard to keep track of evolving legal developments, now is the time, for in the four months since passage of this Act, no fewer than forty-eight cases have been decided,[6] of which

---

**6.** The following cases have found certain provisions of the Act to operate retroactively: *United States v. Department of Health*, 785 F.Supp. 846 (E.D.Cal.1992); *Poston v. Reliable Drug Stores*, 783 F.Supp. 1166 (S.D.Ind.1992); *Sanders v. Culinary Workers Union Local No. 226*, 783 F.Supp. 531 (D.Nev.1992); *Watkins v. Bessemer St. Tech. College*, 782 F.Supp. 581 (N.D.Ala.1992); *Joyner v. Monier Roof Tile, Inc.*, 784 F.Supp. 872

(S.D.Fla.1992); *Long v. Carr*, 784 F.Supp. 887 (N.D.Ga.1992); *Graham v. Bodine Elec. Co.*, 782 F.Supp. 74 (N.D.Ill.1992); *Bristow v. Drake Street, Inc.*, No. 87 C 4412, 1992 WL 14262 (N.D.Ill. Jan. 21, 1992); *Goldsmith v. City of Atmore*, 782 F.Supp. 106 (S.D.Ala.1992); *Guess v. City of Portage*, No. 16 90–276, 1992 WL 8722 (N.D.Ind. Jan. 14, 1992); *Saltarikos v. Charter Mfg. Co., Inc.*, 782 F.Supp. 420 (E.D.Wis.1992);

thirty courts have applied portions of the Act prospectively, while eighteen have applied it retrospectively. The most remarkable characteristic of these cases is the Myrmidon allegiance each pays to other with respect to the analysis chosen to reach either of the respective conclusions. Every case which adopted the *Bowen* presumption disfavoring retroactive application found the Act to apply prospectively. Interestingly, however, not every court adopting the *Bradley* presumption favoring retroactivity found the Act to apply retroactively, though most did.

For example, in *Maddox v. Norwood Clinic, Inc.*, 783 F.Supp. 582 (N.D.Ala. 1992) the plaintiff sought to amend her complaint to include a section 1981 claim based upon alleged discrimination in the denial of a promotion. The court observed that the effect of the Act was that "for the first time, a private employer of less than fifteen employees became accountable for racial employment discrimination occurring after employment began [under section 1981]. The change in Section 1981 must therefore be viewed as substantive." *Id.* at 583. The court found, pursuant to

*Bradley,* that it would be manifestly unjust to apply the amended section 1981 since it would have the effect of altering antecedent rights and liabilities.

A similar result was reached in *Doe v. Board of County Comm'rs*, 783 F.Supp. 1379 (S.D.Fla.1992). There the plaintiff sought to add a section 1981 claim to her complaint, as well as to include in her Title VII claim a jury demand and compensatory and punitive damages claim. The court found that the language of the Act clearly indicated that prospectivity was warranted. It further relied upon the differences between the language of the 1991 Act and the vanquished Act of 1990 to support this result. Thus the court concluded that, with respect to section 1981, the Act created new liabilities for employers. The court stated that the Act "alters the standard for measuring employers' conduct in employment termination, thereby creating a new source of liability for employers." *Id.* at 1384. Therefore, *Bradley* prohibited retroactive application. *See also McCullough v. Consol. Rail Corp.*, 785 F.Supp. 1309

*Stender v. Lucky Stores,* 780 F.Supp. 1302 (N.D.Cal.1992); *King v. Shelby Med. Ctr.,* 779 F.Supp. 157 (N.D.Ala.1991); *Thakkar v. Provident Nat'l Bank,* No. 90–3907, 1991 WL 274827 (E.D.Pa. Dec. 17, 1991); *Davis v. Tri State Mack Distributions, Inc.,* No. LR–C–89–912, 1991 WL 316891 (E.D.Ark. Dec. 16, 1991); *Cary v. CHA,* No. 87 C 6998, 1991 WL 274443 (N.D.Ill. Dec. 13, 1991); *LaCour v. Harris Cty.,* No. 18–891–1532, 1991 WL 321020 (S.D.Tex. Dec. 6, 1991); *Mojica v. Gannett Co., Inc.,* 779 F.Supp. 94 (N.D.Ill.1991).

The courts which have found portions of the Act to apply prospectively only include: *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.1992); *Sofferin v. American Airlines, Inc.,* 785 F.Supp. 780 (N.D.Ill.1992); *Guillory–Wuerz v. Brady,* 785 F.Supp. 889 (D.Colo. 1992); *McLaughlin v. State of New York,* 784 F.Supp. 961 (N.D.N.Y.1992); *Toney v. State of Alabama,* 784 F.Supp. 1542 (M.D.Ala.1992); *McCullough v. Consolidated Rail Corp.,* 785 F.Supp. 1309 (N.D.Ill.1992); *Hameister v. Harley–Davidson, Inc.,* 785 F.Supp. 113 (E.D.Wis. 1992); *Steinle v. Boeing Co.,* 785 F.Supp. 1434 (D.Kan.1992); *Cook v. Foster Forbes Glass,* 783 F.Supp. 1217 (E.D.Mo.1992); *Thompson v. Johnson & Johnson Mgt. Info. Ctr.,* 783 F.Supp. 893 (D.N.J.1992); *Patterson v. McLean Credit Union,* 784 F.Supp. 268 (M.D.N.C.1992); *Kimble v. DPCE, Inc.,* 784 F.Supp. 250 (E.D.Pa.

1992); *Curry v. Chicago Cent. & Pac. R.R.,* No. C90–2013, 1992 WL 25459 (N.D.Iowa Feb. 10, 1992); *Tyree v. Riley,* 783 F.Supp. 877 (D.N.J. 1992); *Maddox v. Norwood Clinic, Inc.,* 783 F.Supp. 582 (N.D.Ala.1992); *West v. Pelican Mgt. Services Corp.,* 782 F.Supp. 1132 (M.D.La. 1992); *Doe v. Board of County Comm'rs,* 783 F.Supp. 1379 (S.D.Fla.1992); *Burchfield v. Derwinski,* 782 F.Supp. 532 (D.Col.1992); *Johnson v. Rice,* No. 2:85–CV–1318, 1992 WL 16284 (S.D.Ohio Jan. 24, 1992); *Simons v. Southwest Petro–Chem, Inc.,* No. 90–2443–V, 1992 WL 25218 (D.Kan. Jan. 27, 1992); *Khandelwal v. Compuadd Corp.,* 780 F.Supp. 1077 (E.D.Va.1992); *Mitchell v. Secretary of Commerce,* No. CIV.A. No. 82–3032, 1992 WL 10509 (D.D.C. Jan. 10, 1992); *Sorlucco v. New York City Police Dep't,* 780 F.Supp. 202 (S.D.N.Y.1992); *McKnight v. Merrill Lynch,* No. 90–C–597 (E.D.Wis. Jan. 9, 1992); *High v. Broadway Indus.,* No. 90–1066–CV, 1992 WL 33860 (W.D.Mo. Jan. 7, 1992); *Van Meter v. Barr,* 778 F.Supp. 83 (D.D.C.1991); *Hansel v. Public Service Co. of Colorado,* 778 F.Supp. 1126, 1136–37 (D.Col.1991); *Alexander v. AMP, Inc.,* 57 Fair Empl.Prac.Cas. (BNA) 768 (W.D.Pa. Dec. 5, 1991); *James v. American Internt'l Recovery, Inc.,* No. 1:89–CV–321RHH, 1991 WL 281734 (N.D.Ga. Dec. 3, 1991); *Conerly v. CVN Cos., Inc.,* 785 F.Supp. 801 (D.Minn.1991).

(N.D.Ill.1992); *Kimble v. DPCE, Inc.*, 784 F.Supp. 250 (E.D.Pa.1992).

With respect to the additional Title VII claims, the court found that although a jury trial and increased damages were procedural in nature and therefore amenable to retroactive application under the *Bradley* presumption, it declined to so apply these portions of the Act since to do so would result in a "piecemeal" approach. *Id.*

The most unusual of the cases finding retroactivity is *Watkins v. Bessemer St. Tech. College*, 782 F.Supp. 581 (N.D.Ala. 1992). In that case the plaintiff sought to amend her complaint to reassert a claim under section 1981. Although the court acknowledged the conflict in the *Bowen* and *Bradley* cases, it decided the issue on different grounds.

The court stated that congressional displeasure with Supreme Court precedent was clear.

> Congress obviously has an understanding of the original intent of § 1981 contrary to the understanding expressed by the majority in *Patterson*. This unique situation creates a question of statutory construction markedly different from, and much narrower than, the question whether Congress in 1991 intended its new civil rights legislation to apply to employer-employee transactions that occurred prior to ... November 21, 1991.

*Id.* at 584. The court then recited from a treatise on statutory construction:

> Although a presumption of change in legal rights is probably reasonable in that an amendment is more frequently used to add to or take a provision from a law than interpret it, the fact of amendment by itself does not indicate the change is of substance or form—whether a right is added to or taken from the original act, or whether a provision in the original act is merely being interpreted, that is, made more detailed or specific. To determine this the circumstances surrounding the enactment must be looked to. If they indicate that the legislature intended to interpret the original act, the

presumption is rebutted. An amendment of an unambiguous statute indicates a purpose to change the law, whereas no such purpose is indicated by the mere fact of an amendment of an ambiguous provision.

*Id.* (quoting 1A Norman J. Singer, Sands, *Sutherland's Statutory Construction*, § 22.30 at 266 (4th ed. 1985)). In other words, an interpretive amendment of an ambiguous statute is presumed to effect no change in previous legal rights. The court reasoned that the original section 1981 was ambiguous, given the close vote in *Patterson*. Yet despite this latent ambiguity, Congress, as well as a host of federal courts, always understood the statute to reach post-formation conduct. Nonetheless, the Supreme Court misinterpreted the law in *Patterson*, thus requiring that Congress clarify its original intent in section 1981 by enacting the 1991 amendments. As a result, the court reached the astonishing conclusion that

> [i]f § 1981 prior to *Patterson* meant what Congress now says it means, the tool of statutory construction recognized by ... Professor Sutherland leads straight to the conclusion that *Patterson* was wrongly decided and that § 1981 was, in fact and law, available to [the plaintiff] prior to November 21, 1991, when she filed her complaint ... under factual circumstances as to which *Patterson* temporarily stood in [her] way.

*Id.* at 585. Thus the court found that the Act applied to the section 1981 claim retroactively.

The court's conclusion illustrates the flaw in its reasoning. It is a truism of constitutional dimension that judicial decisions operate retrospectively. *James B. Beam Distilling Co. v. Georgia*, — U.S. —, 111 S.Ct. 2439, 2442–43, 115 L.Ed.2d 481 (1991); *Bonjorno*, 494 U.S. at 847, 110 S.Ct. at 1582 (Scalia, J., concurring); *United States v. Security Indust. Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982) ("The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student."); *Kuhn v. Fairmont*

*Coal Co.*, 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L.Ed. 228 (1910) ("Judicial decisions have had retrospective application for near a thousand years." (Holmes, J., dissenting)). Whether the duty of the court is "to maintain and expound the [law]" rather than pronouncing new law, as Blackstone maintained, *see Linkletter v. Walker*, 381 U.S. 618, 623, 85 S.Ct. 1731, 1734, 14 L.Ed.2d 601 (1965) (quoting 1 Blackstone, Commentaries 69 (15th ed. 1809)), or "to do something more than discover law; [to] make it interstitially by filling in with judicial interpretation the vague, indefinite, or generic ... terms that alone are but the empty crevices of the law," *id.* at 623–24, 85 S.Ct. at 1734, it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *see also The Federalist* No. 78, at 116 (A. Hamilton) (H. Commager ed. 1949) ("The interpretation of laws is the proper and peculiar province of the courts."). To suggest that a legislative enactment can create affirmative legal obligations which the judicial branch has explicitly found to be nonexistent is to eviscerate the separation of powers so vital to the constitutional system the Federal Courts are sworn to uphold. Congress is empowered to create new law in response to whatever exigencies render legislative action necessary. No principle of constitutional construction empowers Congress to rewrite judicial decisions.

Nor is the Court alone in this view. In *Condit v. United Air Lines, Inc.*, 631 F.2d 1136, 1139–40 (4th Cir.1980), the court found that the *Bradley* presumption was not operative where substantive provisions of new law would impose new obligations on defendant for prior conduct. The court cited *Peony Park v. O'Malley*, 223 F.2d 668, 671 (8th Cir.), *cert. denied*, 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753 (1955), which in turn cited Professor Sutherland's treatise for the following proposition:

> Special Interpretive Statutes. The usual purpose of a special interpretive statute is to correct a judicial interpretation of prior law which the legislature considers inaccurate. Where such statutes are given any effect, the effect is prospective only. Any other result would make the legislature a court of last resort.

1A Sutherland, Statutory Construction, § 27.04 at 464. This result avoids the constitutional difficulties present in the *Watkins* court's analysis.

The same defects are true with respect to the related argument advanced by members of the Senate that the Act works to restore the law as it existed prior to the *Patterson* decision. For example, Senator Kennedy argued that restorative legislation enjoys a presumption of retroactive application:

> And where a new rule is merely a restoration of a prior rule that had been challenged by the courts, the newly restored rule is often applied retroactively, as was the case with the Civil Rights Restoration Act of 1988. That is what the courts have held in *Leake v. Long Island Jewish Med. Ctr.*, 695 F.Supp. 1414 (E.D.N.Y.1988), *aff'd*, 869 F.2d 130 (2d Cir.1989), *Ayers v. Allain*, 893 F.2d 732 (5th Cir.1990), and *Bonner v. Arizona Dept. of Corrections*, 714 F.Supp. 420 (D.Ariz.1989). *But see DeVargas v. Mason & HangerSilas Mason & Co.*, 911 F.2d 1377 (10th Cir.1990).

137 Cong.Rec. S15,486 (daily ed. Oct. 30, 1991). In addition to the constitutional flaw in this argument, the plain language of the Act itself refutes any claim that it was intended to be "restorative." For example, section 2 of the Act provides:

> The Congress finds that—
>
> (1) *additional remedies* under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace;
>
> .        .        .        .        .
>
> (3) legislation is necessary to provide *additional protections* against unlawful discrimination in employment.

(Emphasis added.) Section 3 of the Act provides:

> The purposes of this Act are—
>
> (4) to respond to recent decisions of the Supreme Court by *expanding the scope of relevant civil rights statutes* in order

to provide adequate protection to victims of discrimination.

(Emphasis added.) These sections indicate unmistakably that Congress acted to create new remedies to protect rights Congress felt were inadequately preserved under the civil rights statutes as they had been construed by the Supreme Court.

The restorative interpretation is further undercut by the language of the vanquished 1990 Act, which provided:

> (b) Purposes.—The purposes of this Act are to—
>
> (1) respond to the Supreme Court's recent decisions by *restoring* the civil rights protections that were dramatically limited by those decisions.

Section 2(b)(1) (emphasis added). The absence of this language in the 1991 Act suggests that Congress, in a successful attempt to present an acceptable bipartisan compromise to President Bush, intentionally rejected language which described the law as restorative. This creates an irresistible argument that Congress intended to do exactly what the 1991 Act claims: create new rights. Thus the language of the new Act, when compared with that of the vetoed Act, refutes the restorative argument.

Finally, even if there were merit to the restoration argument, reliance on the analogy to the Civil Rights Restoration Act of 1987 is misplaced. There the language made specific reference to congressional intent *"to restore* the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws previously administered." *See* Restoration Act § 2, 102 Stat. at 28 (1988) (emphasis added). This again illustrates aptly Congress' ability to express itself clearly when it chooses to do so. There is no reason to suppose that it could not have expressed itself with equal clarity in the 1991 Act had it chosen to express an intention to enact a restorative bill. It is no more the province of this Court to re-write the language of Congress than it is for Congress to "restore" rights which never existed under the Supreme Court's interpretation of prior law. Accordingly, the Court rejects the rationale of the *Watkins* case.

The foregoing analysis leads the Court to the ineluctable conclusion that, with respect to section 1981 claims the Civil Rights Act of 1991 applies prospectively. We base this conclusion on the *Bowen* presumption that laws are presumed to apply prospectively in the absence of specific statutory language or legislative history which requires retroactive application. The language of the Act provides no clear statement suggesting congressional intention for retroactive application. Moreover, what little linguistic support there might be for such a result is entirely refuted by the legislative history. In addition, the legislative history of the Act fails to provide a clear statement of congressional intent to apply the Act retroactively. Finally, the cases which have construed this question have arrived at decidedly different conclusions, thus providing little authority upon which to base a decision. Nevertheless, those courts which have followed the *Bowen* presumption have engaged in substantially the same analysis as this court, and have arrived at the same conclusion. Conversely, those courts which have followed the *Bradley* presumption, to the extent they dealt with section 1981, have used a case of limited application to create retroactive obligations for substantive statutory provisions and have achieved contradictory results. Finally, even if *Bradley* were the standard by which the Court was to review the Act, the Court holds that it would be manifestly unjust to apply section 1981 retroactively since it would impose a new legal standard on the Defendants and thus impose liability which did not exist at the time the alleged conduct occurred.[7] Therefore, the Plaintiff will not be allowed to

---

7. This result obtains even though the conduct in this case is pre-*Patterson* conduct. It is suggested that because the courts construed section 1981 to reach post-formation conduct at the time Mr. Craig's cause of action arose, the law required no more of the Defendants then than it does now. It is posited that it is not prejudicial to the Defendants in this case to apply this section retroactively since they knew at the time they engaged in the contested conduct that it was prohibited.

assert any claims under the amended version of section 1981.

## VII. THE PLAINTIFF'S PATTERSON CLAIMS

The Court turns finally to that portion of the Defendants' motion which seeks summary judgment as to the Plaintiff's remaining claim. In support of the Plaintiff's claim he submits the affidavit of Robert Reight, who was a supervisor at the facility in which Craig was to have performed demolition work. He claims that the Defendant Myers was his supervisor at the time the pre-bid meeting was held. Reight Aff. at ¶ 2. He then states that

My staff and I were instructed to present the Plans for inspection by certain contractors. The named contractors were not minority controlled contractors. I never received instructions to show the plans to Stan Craig. These plans were much more detailed than those which were generally made available to as part of the specifications for the demolition project and were sufficiently detailed to permit a determination to be made as to the location of asbestos in the boilers to be removed. The plans and specifications prepared by Fosdick and Hilmer did not contain information as to the location of asbestos in the boilers.

*Id.* at ¶ 3.

As an initial matter, the affidavit is utterly silent as to any discriminatory conduct by Otto Hilmer, Daniel Shields, or Walter Graub. Indeed, their names are never even mentioned by the affiant. Therefore, the Reight affidavit cannot support the Plaintiff's claim against these individuals. The only individual mentioned specifically is Bert Myers. He states that he heard Myers make racially derogatory remarks about blacks, and once "specifically instructed [Reight] not to let that 'nigger' back in the McCracken Power plant." *Id.* at ¶ 6. He states additionally that "[i]n a separate contract situation where a black contractor had been hired and later fired, I heard Bert Myers indicate that he was going to. 'get rid of that nigger.' "

Any statements Myers may have made after termination of the contract are of little consequence in this action. Myers' post-formation conduct is not directly relevant to the question whether he engaged in formation-related discrimination. Moreover, his statement after the termination that he did not want Craig back in the plant does not inform the inquiry whether he intentionally discriminated against the Plaintiff. As to the allegations concerning Myers' general statements regarding blacks, even if true it is of no probative value to the question whether Myers discriminated in the formation of this Plaintiff's contract. Nor is his testimony helpful when he relates "a separate contract

Although there is some superficial appeal to this argument, it quickly dissipates after a moment's commodious reflection. As stated earlier, the Supreme Court's decision in *Patterson* established that section 1981 had no application to post-formation conduct. It cannot be said, therefore, that the law required something more than that which the judicial department affirmatively declared. According to the Supreme Court, the *Patterson* Defendant's alleged post-formation conduct was not prohibited by section 1981. Though it might be argued that such a conclusion is a legal fiction, it is a fiction of constitutional dimension. To maintain otherwise is to demote fundamental constitutional precepts to a servile condition wholly foreign to our system of jurisprudence. Moreover, it is unprincipled to suggest that application of a constitutional standard should be waived because some would disagree with its operation. There is no principle of law that allows the Court to substitute its sense of fair play for that which is constitutionally memorialized.

It is interesting to note further that the paradigm pre-*Patterson* case, that is, *Patterson* itself, arrives at precisely the same conclusion. There the court stated that to allow retroactive application of the 1991 Act to revive claims lost under the Supreme Court decision "would place new and unanticipated obligations on the defendant.... [T]hese events occurred in the early 1980s and were governed by a law, section 1981, which, as the Supreme Court interpreted, did not apply to the plaintiff's case." *Patterson v. McLean Credit Union,* 784 F.Supp. 268, 279 (M.D.N.C. 1992). It is simply untenable to suggest that conduct occurring prior to *Patterson* and not yet adjudicated should be analyzed under a standard of law which was found defective. Although a different result would have obtained had Congress chosen to make the Act retroactive, such is not the case.

situation." It is not clear what is meant by that statement. Even if it were clear, and even if Myers made such a statement, it appears from the affidavit that he was attempting to terminate a contract, not discriminate in its formation. Finally, it is not even clear that such an allegation would be relevant to this case since neither the occasion of the remark or the date relative to this action were included in the affidavit.

Turning to the Plaintiff's affidavit, it is at once clear that it cannot support his claim. It is well settled that mere conclusory allegations contained in an affidavit opposing a motion for summary judgment are insufficient to demonstrate the existence of a material fact. *Sweats Fashions, Inc. v. Pannill Knitting*, 833 F.2d 1560, 1562, 1564 (Fed.Cir.1987). Rather, the affiant must make a statement of specific facts sufficient to apprise the Court of an evidentiary conflict in the record. *Id.* at 1564. Here, however, the Plaintiff has stated that he was subjected to harassment because of the "defendants' collective refusal to accept my asbestos bid." Craig Aff. at ¶ 9. This assertion fails to describe what the Defendants did in the formation of the contract that would evince an intent to discriminate. To the extent the Plaintiff is suggesting that the Defendants deprived him of an opportunity to renegotiate his contract, which arguably could give rise to a new and separate contract, he fails to state how the refusal was motivated by racial animus. He further claims that "[t]he defendants collectively insisted that I remove all asbestos prior to the demolition of any portion of the boiler. This was physical [sic] impossible to do." *Id.* Irrespective of whether it was possible to accomplish the task, the allegation does no more than suggest that the Defendants required him to perform that which was compelled under the terms of the contract. It fails to make any asseveration relative to animus in the formation of a contract. The same defects are true of the other allegations in the affidavit. It is enough to point out that, some seven years after this conduct is claimed to have occurred, and five years after this suit was filed, the Plaintiff has failed to produce specific evidence of discriminatory behavior by the Defendants. Although the moving party bears the burden of establishing the absence of a genuine issue as to any material fact, the burden may be met by showing that despite sufficient opportunity for discovery, there is no evidence to support an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). Having provided the Court with vague and self-serving allegations of discrimination, the Plaintiff has failed to carry his burden in this matter.

WHEREUPON, upon consideration and being duly advised, the Court finds that the Civil Rights Act of 1991 applies prospectively with respect to claims under section 1981, thus precluding the Plaintiff's post-formation discrimination claims. Further, the Court finds that the Defendants' motion for summary judgment is meritorious, and it is, therefore, GRANTED. This case is dismissed in its entirety.

IT IS SO ORDERED.